UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-11778-RGS

C.N. WOOD COMPANY, INC.

v.

LABRIE ENVIRONMENTAL GROUP and
SANITARY EQUIPMENT CO., INC.

MEMORANDUM AND ORDER ON
LABRIE ENVIRONMENTAL GROUP'S MOTION TO DISMISS

June 5, 2013

STEARNS, D.J.

This opinion addresses the threshold issue of whether the "Distributorship
Agreement" (Agreement) between plaintiff C.N. Wood Company, Inc. (Wood) and
Labrie Environmental Group (Labrie) constitutes a de facto franchise agreement under
Mass. Gen. Laws ch. 93B, § 1.  If it does, then Wood's lawsuit, which was originally
filed in the Massachusetts Superior Court (before being removed to the federal district
court) survives the choice of law and choice of forum provisions of the Agreement that
designate the Province of Quebec, Canada, as the parties' exclusive litigating arena.
*See* Mass. Gen. Laws ch. 93B, § 15(e).  If it does not, the case must be dismissed in
favor of litigation in the Quebec courts.

Wood is a family-owned Massachusetts business that sells and services a variety

of heavy equipment lines used in the construction, agricultural, and environmental industries.   Since the 1960's, Wood has sold and serviced Leach brand refuse collection trucks in Massachusetts and Rhode Island.   In May of 2006, Labrie purchased Leach's assets and terminated Leach's then-existing agreement with Wood. In September of 2008, Labrie and Wood entered into the now-controlling Agreement. Under the Agreement, Wood is designated as Labrie's exclusive distributor in Massachusetts and Rhode Island for the Leach and Labrie brands of waste collection vehicles.  The Agreement had an initial term of one year, which automatically renewed unless a party gave notice of an intent to terminate no later than 60 days prior to the expiration date.

On January 7, 2011, Labrie sent Wood a notice of nonrenewal under the Agreement, effective April 30, 2011.  Later that year, Labrie chose Sanitary Equipment Co., Inc. (SEC), a West Haven, Connecticut waste equipment dealer, to carry its line of refuse vehicles in Massachusetts and Rhode Island.    Wood during the interim continued to sell the Labrie brand.  On July 20, 2012, Wood received a notice of termination from Labrie.   Thereafter, Labrie removed Wood from its website listing of authorized distributors.

In August of 2012, Wood sued Labrie in the Massachusetts Superior Court.  In its Verified Complaint, Wood asserted that its Agreement with Labrie was governed

by the dealer-friendly protections of the Massachusetts and Rhode Island franchise laws.  Wood alleged that Labrie had wrongfully terminated what Wood characterized as a  franchise agreement without squaring the corners of the notice and good cause requirements of Mass. Gen. Laws ch. 93B, § 5[1] and R. I. Gen. Laws 1956, § 31-5.1-4.[2]

---

[1] Mass. Gen. Laws ch. 93B, § 5(a) states that

[i]t shall be a violation of subsection (a) of section 3 for a manufacturer, distributor or franchisor representative without good cause, in bad faith or in an arbitrary or unconscionable manner: (1) to terminate the franchise agreement of a motor vehicle dealer; (2) to fail or refuse to extend or renew the franchise agreement of a motor vehicle dealer upon its expiration; (3) to offer a renewal, replacement or succeeding franchise agreement containing terms and conditions the effect of which is to substantially change the sales and service obligations, capital requirements or facilities requirements of a motor vehicle dealer; or (4) to amend, add or delete any other material term or condition set forth in a motor vehicle dealer's franchise agreement.

[2] R.I. Gen. Laws 1956, § 31-5.1-4(d) provides that

[i]t shall be a violation of this chapter for a manufacturer to terminate, cancel, or fail to renew the franchise of a new motor vehicle dealer except as provided in this subsection:

(1) Notwithstanding the terms, provisions, or conditions of any franchise, whether entered into before or after the enactment of this chapter or any of its provisions, or notwithstanding the terms or provisions of any waiver, whether entered into before or after the enactment of this chapter or any of its provisions, no manufacturer shall cancel, terminate, or fail to renew any franchise with a licensed new motor vehicle dealer unless the manufacturer has:

3

Wood also alleged a breach of contract.[3]

In September of 2012, Labrie removed the case to this court on the basis of diversity jurisdiction.  Labrie then moved to dismiss the Verified Complaint pursuant to Fed. R. Civ. P. 12(b)(3) and 12(b)(6),[4] pointing to the stipulation in the underlying Agreement that

> all claims arising out of . . . this Agreement . . . shall be governed exclusively by the internal laws in force of the Province of Quebec (Canada) and the federal laws of Canada applicable therein without any reference to and specifically excluding conflict of law . . . as well as . . .

--------------------

> (i) Satisfied the notice requirement of this subsection;
>
> (ii) Has good cause for the cancellation, termination, or nonrenewal;
>
> (iii) Has not committed any violations set forth in subsection (b) of this section; and
>
> (iv) Has acted in good faith as defined in this chapter and has complied with all provisions of this chapter.

[3] Wood also brought in SEC as a third-party defendant, arguing that SEC had usurped its rightful place as Labrie's exclusive dealer in Massachusetts and Rhode Island.  The only relief sought against SEC was injunctive, as SEC was not party to Wood's Agreement with Labrie and therefore immune from any breach of contract claim.

[4] Pursuant to Fed. R. Civ. P. 12(d), the court converted Labrie's motion to dismiss to one for partial summary judgment and authorized the parties to pursue discovery on the limited question of whether the "community of interest" shared by Wood and Labrie was sufficient to be deemed a constructive franchise under Massachusetts law.

the laws of the State of Massachusetts.  The Federal and Provincial courts
in the judicial district of Quebec Province of Quebec shall be the only and
exclusive courts of law or equity competent to interpret this Agreement
and decide any dispute or litigation arising therefrom.

Wood countered that because the Agreement established a de facto franchise

relationship, Massachusetts law vests exclusive jurisdiction over the parties' dispute

in its own courts (to the exclusion of Canada or anyone else).  *See* Mass. Gen. Laws

ch. 93B, § 15(e) ("Notwithstanding any term or provision of a franchise agreement to

the contrary: (1) the laws of the commonwealth shall govern the interpretation of the

franchise agreement of a motor vehicle dealer located in the commonwealth and the

performance of the parties thereunder, and (2) the courts of the commonwealth and the

federal courts with jurisdiction over cases filed in the district of Massachusetts shall

have exclusive jurisdiction with respect to any action brought under this chapter or any

action brought by a manufacturer, distributor or motor vehicle dealer concerning the

franchise of a motor vehicle dealer located in the commonwealth.").

Under Mass. Gen. Laws ch. 93B, § 1, a franchise agreement is defined as

an oral or written arrangement for a definite or indefinite period in which
a manufacturer or distributor grants to a motor vehicle dealer a license to
use a trade name, service mark, or related characteristic, and in which
there is a community of interest in the marketing of new motor vehicles
or services related thereto at wholesale, retail, leasing, or otherwise.

Mass. Gen. Laws ch. 93B, § 1.  It is uncontested that Labrie granted Wood the right

to use its marks in association with the sales and servicing of Leach and Labrie brand refuse collection vehicles.   However, the parties dispute whether they shared a "community of interest."   The term "community of interest" is not defined in the Massachusetts franchise statute and no Massachusetts court has had the occasion to construe it in any presently relevant context.   Courts in other jurisdictions have, however, given some heft to the term in interpreting similar state franchise laws.

The New Jersey Franchise Practices Act (NJFPA), for example, defines a franchise in almost identical terms as those used in Massachusetts law, that is,

> a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J. Stat. § 56:10-3.  The Third Circuit construed "community of interest" to

> mean[] more than the mere fact that two parties share in the profits realized when a product makes its way from manufacturer to the ultimate consumer.  Courts analyzing whether an alleged franchisee is part of the class that is protected by the [NJFPA] have looked for specific proof, focusing on certain indicia of control by the supposed franchisor over the supposed franchisee.

*Colt Indus. Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 120 (3d Cir. 1988) (internal citations omitted).  As viewed by the Third Circuit, the phrase might better be transcribed as a "commonality of interests" in which the subordinate interests

of the franchisee are merged with the dominant interests of the franchisor.  In other words, there is no "community of interest where [the alleged franchisee] failed to establish that it was subject to the whim, direction and control of a more powerful entity whose withdrawal from the relationship would shock a court's sense of equity." *Id.* at 120-121.

Subsequently, in *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324 (1992) (*ISI*), the New Jersey Supreme Court took an almost identical tack in offering its own interpretation of the meaning of "community of interest" under the NJFPA.  Acknowledging that a "community of interest" is a "broad, elastic and elusive" concept*, id.*, at 359, the Court approvingly cited cases that inquired into whether a

> "symbiotic relationship" exists between the parties. That analysis is similar to the "interdependence" requirement urged by the *Ziegler* [*Co. v. Rexnord, Inc.*, 139 Wis. 2d 593 (1987)] court and takes into account the extent of the licensor's control and the licensee's economic dependence discussed by other courts. *See* [*Cassidy Podell Lynch, Inc. v.*] *SnyderGeneral*,[] 944 F.2d [1131,] 1140 [(3d Cir. 1991)]. In addition, the "continuing financial interest" requirement articulated in *Ziegler,* by emphasizing that the franchisee "demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health of the person," *Ziegler*, [139 Wis. 2d at 605], echoes the extent of the franchise-specific investment discussed by other courts as a hallmark of the franchise relationship. *See New Jersey American,* [*Inc. v. Allied Corp.*,] 875 F.2d [58,] 62 [(3rd Cir. 1989)].

*Id.*, 130 N.J. at 361-362.  So understood, a "community of interest" requires that the franchisee make such significant investment in the franchise as to grant essentially all of the controlling power in the relationship to the franchisor.

> A "community of interest" exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skill that will be of minimal utility outside the franchise. [*ISI*, 130 N.J. at 359.]  The Act requires that franchisor and franchisee share a community of interest because, "once a business has made substantial franchise-specific investments it loses all or virtually all of its original bargaining power regarding the continuation of the franchise."  *Id.* at 357[].  Importantly, "[c]ommunity of interest means more than the mere fact that two parties share in profits or that the distributor rely on a single supplier." . . . Rather, in addition to such business entwinement, a franchise is characterized by certain "indicia of control" of franchisor over franchisee. *New Jersey American, Inc.* [], 875 F.2d [at] 62 [] (citing *Colt Industries Inc. v. Fidelco Pump & Compressor Corp.,* 844 F.2d 117 (3d Cir.1988)).

*Engines, Inc. v. MAN Engines & Components, Inc.*, 2010 WL 3021871, at *6-7 (D.N.J. July 29, 2010).

The Wisconsin Fair Dealership Law (WFDL) does not use the specific term "franchise," but it defines the term "dealership" in a similar way as

> a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02.  The WFDL in turn defines a "community of interest" to mean "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services."  *Id.*  The statutory definition, as courts called upon to interpret it have observed, is mostly "vague and unhelpful, for it permits no ready way in which to differentiate a dealership from any ordinary vendor/vendee relationship."  *Frieburg Farm Equip., Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir. 1992) (internal citation omitted).

> Rather, in determining whether parties shared a community of interest, the court has established two guideposts.  The first is whether the parties shared a continuing financial interest in the operation of the dealership or the marketing of a good or service.  [*Central Corp. v. Research Prods. Corp.*, 272 Wis. 2d 561, 581 (2004)]*; Bush* [*v. Nat'l School Studios, Inc.*]*,* 139 Wis. 2d [635,] 654-655[ (1987)].  The second is whether the parties were interdependent, i.e., "'the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship.'" *Central Corp.,* 272 Wis. 2d at 581[] (quoting *Ziegler,* 139 Wis.2d at 605[]).  "When construed together, these guideposts must reveal an interest in a business relationship great enough to threaten the financial health of the dealer, if the grantor were to decide to exercise its power to terminate." *Id.*

*Home Protective Servs. v. ADT Sec. Servs., Inc.*, 348 F. Supp. 2d 1010, 1013 (E.D. Wis. 2004),  aff'd, 438 F.3d 716 (7th Cir. 2006).  In essence,

> the function of the community of interest requirement is to identify situations in which the alleged grantor has the alleged dealer "over a barrel." *See, e.g., Praefke Auto. Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.,* 255 F.3d 460, 464 (7th Cir. 2001); *Moodie v. Sch. Book Fairs, Inc.,* 889 F.2d 739, 744 (7th Cir. 1989). An alleged grantor has an

alleged dealer over a barrel when the dealer has invested "heavily" in the grantor's brand because, when a dealer has made such brand-specific investments, an unscrupulous grantor can behave opportunistically and "exploit the fear of termination that naturally attends a dealer's investment in grantor-specific assets." *Praefke,* 255 F.3d at 464–65; *Frieburg Farm Equip.,* 978 F.2d at 399. Thus, the Seventh Circuit appears to have defined "the persons or entities the [Wisconsin] legislature intended to protect," *Ziegler,* 139 Wis.2d at 601, 407 N.W.2d 873, as those who are subject to exploitation at the hands of a supplier.

*Id.* at 1014.

The Wisconsin and New Jersey courts' concern to protect dealers/franchisees from exploitation by suppliers echos one of the "two central purposes" of the Massachusetts franchise laws. *See Cadillac/Oldsmobile/Nissan Ctr., Inc. v. Gen. Motors Corp.*, 391 F.3d 304, 306 (1st Cir. 2004) (citations omitted). The purpose primary to this case is "to curb the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers."[5] *Id.* (internal quotation marks and citation omitted). Thus, a "community of interest" in the context of Mass. Gen. Laws ch. 93B must reflect the "potentially oppressive power" of the franchisor over the franchisee – because of the substantial franchise-specific investment of the franchisee that is of minimal utility outside of the franchise, the franchisor has explicit or implicit control over the relationship such that he has the franchisee "over

---

[5] The other central purpose is "to regulate competition in the retail automobile industry for the benefit of the public at large." *Id.*

10

a barrel." *Id.*

Working within this framework, Wood attempts to cast itself as a virtual thrall to Labrie, arguing that it was subject to myriad obligations under the Agreement, including using its best efforts to promote the sales of Labrie products, providing trained sales and service staff, service facilities, tools, and a parts inventory to keep Labrie owners happy, performing pre-delivery inspections and warranty work on all Labrie vehicles sold in its geographical territory,[6] and offering regular product demonstrations.  Wood asserts that to perform under the Agreement, it typically maintained some $300,000 of Labrie spare parts in inventory and at one point invested in an $80,000 crane to mount Leach/Labrie truck bodies onto their chassis.[7]

The larger picture, however, casts the relationship between Wood and Labrie in a different light.  It is undisputed that the sales of Labrie products comprise less than 7-10% of Wood's total annual gross sales.  Of compelling significance is the fact that

---

[6] Under the Agreement, Labrie sold directly to large national or regional customers while smaller private customers purchased Labrie vehicles from Wood.

[7] Wood speculates that the loss of the Labrie brand could idle eight of its vehicle service bays and might lead to the layoff of sales and service personnel.  Wood also complains that it has never been paid full market value for service work it has historically performed on Labrie products.  None of this sheds any real light on the issue of whether Wood is a Labrie franchisee or a vendee, as the presumed impact of the loss of the exclusive right to market the Labrie brand would be the same in either case.

Wood not only carries multiple product lines,[8] but also sells and services products that directly compete with those of Labrie, including well-known brands such as Heil, Loadmaster, and New Way.  To give an illustrative example, since 2008, the sale of Heil refuse collection vehicles has amounted to 40% ($2 million) of Wood's annual $5 million in sales of waste collection vehicles.  It is true, as Wood asserts, that Mass. Gen. Laws ch. 93B, § 13 explicitly protects multi-brand automobile dealerships, and therefore the fact that it sells competing brands of products is not in and of itself determinative of the issue of whether it is a franchisee of Labrie.  But this does nothing to advance Wood's cause.  As Labrie points out, there is nothing about the maintenance of service bays that is so Labrie-specific as to have no utility outside of the Labrie line of products.[9]  Labrie also notes that it is undisputed that Wood has always set its own prices for Labrie products, has enjoyed a quick turn over in its Labrie parts inventory, and has generated significant sales revenues and commissions from the rental of Labrie demonstration vehicles.  *See Home Protective Serv*s., 348 F. Supp. 2d at 1017 (finding no "community of interest" where a dealer has recouped its entire investment over six

---

[8] Wood's website offers 18 different brands for sale.  Wood advertises Komatsu – the heavy construction equipment maker – and not Labrie, as its leading product line.

[9] It is undisputed that the service bays and the crane were not designed exclusively for use in servicing Labrie vehicles.  Wood's assertion of fallow bays and staff layoffs derive from the potential loss in *volume* of business, not because the bays, crane, and employees have no other utility outside of servicing Labrie products.

years of operation).   In other words, there is no evidence that Labrie had Wood "over a barrel," or even a bucket.  This case easily passes the "walk like a duck" test.  Both partes mutually profited from the vendor/vendee relationship while it endured.[10]  But there was no "community of interest" that would have even arguably converted this relationship into a franchise.  Consequently, the Agreement's choice of law and choice of forum provisions are controlling.

ORDER

For the foregoing reasons, Labrie's motion to dismiss is <u>ALLOWED</u> without prejudice.  Because Wood has not alleged any viable claims against SEC, the Verified Complaint is dismissed in its entirety, and the Clerk will close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[10] It is worth noting that the parties expressly agreed that "no franchise of any kind is granted by [Labrie] in favor of [Wood] under the terms [of the Agreement.]" Agreement § 17.1.